## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRUSTEES OF THE I.U.O.E. LOCAL 478 ANNUITY FUND ET AL, | No. 3:22-cv-01200 (MPS) |
| *Plaintiffs*, | |
| v. | |
| NATIONAL SHORING, LLC, | |
| *Defendant*. | |

## RULING ON MOTION FOR DEFAULT JUDGMENT

Plaintiffs, trustees of a multi-employer employee benefit plan and I.U.O.E. Local Union No. 478 (the "Union"), bring this action against Defendant National Shoring, LLC ("National Shoring") for failing to make certain contributions to the benefits plan in breach of a collective bargaining agreement and in violation of the Employee Retirement Income Security Act ("ERISA"). Plaintiffs seeks damages including interest. They move for default judgment against National Shoring, which has failed to appear in this action. For the reasons set forth below, I grant the motion for default judgment.

## I.     BACKGROUND

The following facts, which I accept as true as a result of the entry of default, are taken from the Plaintiffs' complaint, ECF No. 1, their motion for default judgment, ECF No. 11, and the attached exhibits.

National Shoring entered into a collective bargaining agreement (the "Agreement") with the Union. ECF No. 1 at ¶ 6. Under the Agreement, National Shoring is required to pay certain sums of money for each hour its employees work in employment covered under the Agreement. *Id.* at ¶ 7. These monies are to be paid to the following employee benefit funds: the I.U.O.E. Local 478 Annuity Fund, the Operating Engineers Local 478 Training and Skill Improvement

1

Fund, the I.U.O.E. Local 478 Pension Fund, the I.U.O.E. Local 478 Supplemental Unemployment Benefits Fund, and the I.U.O.E. Local 478 Health Benefits Fund (collectively, the "Funds").  *Id.* at ¶¶ 1, 7.  As is relevant here, National Shoring employed certain employees covered under the Agreement from January 2016 through the filing of the complaint.  *Id.* at ¶ 8.

The Agreement authorizes the Funds to conduct routine payroll audits and binds National Shoring to the Funds' Collection and Audit Policy,[1] *see* ECF No. 11-3 at 14–15, 60–61, 106–07, which requires National Shoring to pay interest, liquidated damages, reasonable attorneys' fees, and sheriff and court costs related to any contributions that are not timely paid into the Funds, *see id.*; ECF No. 11 at ¶ 9.  To facilitate payroll audits, the Agreement and the Fund's Collection and Audit Policy obligate National Shoring to submit payroll records and other relevant financial documents to the Funds' auditors upon receipt of notice from the Funds.  ECF No. 11 at ¶ 16; *see* ECF No. 11-4.

During a routine payroll audit of National Shoring, the Funds discovered $63,730.25 in unpaid benefit contributions and $2,144.17 in unpaid union dues between November 2017 and December 2020.[2]  *Id.* at 3 ¶ 10.[3]  The Funds incurred $2,066.25 in performing this audit.  *Id.* at 4 ¶ 10.  In addition, the Funds and their auditors provided notice seeking payroll documentation to

---

[1] In addition to the Agreement and the Fund's Collection and Audit Policy, the documents filed by Plaintiffs (including the Agreement itself) reference the "Trust Agreements" or the "Trust Agreements of the Funds."  *See* ECF No. 1 at 3 ¶¶ 10, 18; ECF No. 11-1 at 3; ECF No. 11-3 at 14, 60, 107; ECF No. 11-7 at ¶ 8.  But Plaintiffs have not attached these agreements to any of their filings or provided a description of them, so I do not comment or rely on those agreements.

[2] Plaintiffs' complaint states that the payroll audit covered the period from November 2017 to December 2021.  ECF No. 1 at 3 ¶ 10.  However, in their motion for default judgment, Plaintiffs indicate that the audit covered the period from November 2017 to December 2020, ECF No. 11-1 at 3 ("The Complaint alleges that National Shoring has failed to pay its outstanding audit balance for the time period of November 2017 through December 2020."), and the exhibits to the motion for default judgment support the December 2020 date, *see, e.g.*, ECF No. 11-5 at 12–22; ECF No. 11-6 at 2.  Thus, I conclude that the payroll audit covered the period from November 2017 to December 2020, rather than December 2021.

[3] Plaintiffs' complaint contains two paragraphs numbered ten, one beginning on page three of the complaint and the other on page four.  For clarity, when citing these paragraphs, I have included the page numbers on which each of the paragraphs begin.

conduct a payroll audit for the period from January 2021 to present. *Id.* at ¶ 17. National Shoring failed to provide these documents. *Id.* at ¶ 18.

Plaintiffs initiated this action with a complaint filed September 23, 2022. ECF No. 1. On October 26, 2022, Plaintiffs served the summons and a copy of the complaint on Susan Bove, Office Manager and Benefits and Payroll Specialist of National Shoring. ECF No. 13; ECF No. 14 at ¶ 5. On January 4, 2023, Plaintiffs moved for default entry, ECF No. 9, which the Clerk granted on January 11, 2023. ECF No. 10. Plaintiffs filed a motion for default judgment on February 10, 2023. ECF No. 11. Because Plaintiffs did not file adequate proof demonstrating that Susan Bove was authorized to accept service of process, I denied the motion without prejudice and notified Plaintiffs that to renew the motion, they must file proper proof of service. ECF No. 12. On August 14, 2023, Plaintiffs submitted a supplemental affidavit of service, ECF No. 13, an affidavit of the Funds Contribution Supervisor, ECF No. 14, and several exhibits regarding service.

## II.   LEGAL STANDARD

Courts may grant default judgment only if the defendant was properly served and the court has personal jurisdiction. *See Nature's First Inc. v. Nature's First Law, Inc.*, 436 F. Supp. 2d 368, 372 (D. Conn. 2006) ("A plaintiff must effectuate valid service of process before the district court can assert personal jurisdiction over a defendant."). Although "a default constitutes an admission of all the facts 'well pleaded' in the complaint, it does not admit any conclusions of law alleged therein, nor establish the legal sufficiency of any cause of action." *In re Indus. Diamonds Antitrust Litig.*, 119 F. Supp. 2d 418, 420 (S.D.N.Y. 2000). It therefore "remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action." *Leider v. Ralfe*, No. 01-CV-03137, 2004 WL 1773330 at *7 (S.D.N.Y. July 30, 2004); *Bricklayers & Allied Craftworkers*

*Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC*, 779 F.3d 182, 187 (2d Cir. 2015) ("[T]he court may, on plaintiffs' motion, enter a default judgment if liability is established as a matter of law when the factual allegations of the complaint are taken as true.").

## III.   DISCUSSION

### A.   Service

Under the Federal Rules, a corporation, partnership, or association may be served in one of two ways: either (1) by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made," Fed. R. Civ. P. 4(e)(1), or (2) "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant," Fed. R. Civ. P. 4(h)(1)(B). Connecticut law provides that

> [a] limited liability company . . . may be served with any process, notice or demand required or permitted by law by any proper officer or other person lawfully empowered to make service leaving a true and attested copy with such company's registered agent, or at his or her usual place of abode in this state.

Conn. Gen. Stat. § 34-243r(a).   If process cannot be served on the company's registered agent, "service may be made by any proper officer or other person lawfully empowered to make service handing a copy to the individual in charge of any regular place of business or activity of the company . . . ."   Conn. Gen. Stat. § 34-243r(d).

Alternatively, a limited liability company may be served under Conn. Gen. Stat. § 52-57(c), which governs service on private corporations but may also be used as a means to serve a limited liability company.  *See Altuz v. Prospect Omega, LLC*, No. UWYCV126017178S, 2013

WL 2131949, at *3 (Conn. Super. Ct. Apr. 26, 2013); *see also* Conn. Gen. Stat. § 34-243r(f).

That statute provides for service upon

> the president, the vice president, an assistant vice president, the secretary, the assistant secretary, the treasurer, the assistant treasurer, the cashier, the assistant cashier, the teller or the assistant teller or its general or managing agent or manager or upon any director resident in this state, or the person in charge of the business of the corporation or upon any person who is at the time of service in charge of the office of the corporation in the town in which its principal office or place of business is located.

Conn. Gen. Stat. § 52-57(c).

Because Plaintiffs do not allege that Susan Bove was a registered agent for National Shoring, nor that they first tried to serve the company's registered agent, the service of process does not satisfy Conn. Gen. Stat. § 34-243r.[4]  *See Dominguez v. Hernandez*, No. 21-CV-7051, 2023 WL 2575224, at *12 (E.D.N.Y. Feb. 22, 2023) (applying Connecticut law and recognizing that Conn. Gen. Stat. § 34-243r "required that Plaintiffs first try to serve the registered agent of [Defendant] LLC"), *report and recommendation adopted*, 2023 WL 2574876 (E.D.N.Y. Mar. 20, 2023).

In the alternative, for service to be proper under Conn. Gen. Stat. § 52-57(c), I must determine whether Susan Bove is an individual whom the statute authorizes to accept service. "[U]nder § 52-57 (c) the terms 'or its general or managing agent or manager' are concom[]itant terms meaning a person whose position, rank, duties and responsibilities make it reasonably certain that the corporation will be apprised of service made upon that person." *Nelson v. Stop & Shop Companies, Inc.*, 25 Conn. App. 637, 642 (1991).  The determination of whether a person satisfies that definition is a question of fact regarding "whether the duties of [the person served]

---

[4] In my previous ruling on Plaintiffs' motion for default judgment, I took judicial notice of public records indicating that the registered agent for National Shoring is Peter Bove, not Susan Bove.  ECF No. 12 at 4 n.1.

are such that the corporation would, in the normal course, be informed that the service has been made." *Id.*

Here, the marshal states that when he arrived at the business address of National Shoring, he asked for the office manager, at which point Susan Bove accepted service. ECF No. 13. Plaintiffs also submit several exhibits in support of their motion, including certified payroll records indicating that Susan Bove serves as a "Payroll Admin" for National Shoring. ECF No. 14-2 at 2–3. Although § 52-57(c) does not specifically authorize a "Payroll Admin" to accept service, "neither the employment status nor the job title of the person upon whom service is made is dispositive of the issue of whether the person fulfills the role of manager within the meaning of [the statute]." *Fusari v. Picerne Investment Pool*, No. HHBCV065000966, 2007 WL 2594893, at *1 (Conn. Super. Ct. Aug. 27, 2007). A "credit manager," for example, was authorized to accept service under the statute where the manager accepted the papers and never indicated that he was unauthorized to accept service, neither of the two officers and directors of the company were at the office, and the president's testimony did not identify an individual other than the credit manager as being in charge of the office at the time. *See Pantlin & Chananie Dev. Corp. v. Hartford Cement & Bldg. Supply Co.*, 196 Conn. 233, 237 (1985).

The marshal's supplemental affidavit indicates that Susan Bove held herself out to be the office manager and does not suggest that she ever indicated that she was unauthorized to accept service. ECF No. 13. The Funds' Contribution Supervisor further states that Susan Bove has "acted as the Office Manager," has been her point of contact at National Shoring, and is married to Peter Bove, the owner and registered agent of National Shoring. ECF No. 14 at ¶¶ 4–5. And in 2022, Susan Bove signed, on behalf of Peter Bove, the company's Annual Report to the Secretary of State, ECF No. 14-3 at 3, and the company listed its business email address as an

account presumably belonging to Susan Bove, *id.* at 1 (listing "sue@nationalshoring.com" as the company's business email address).

Because these facts indicate "the duties of [Susan Bove] are such that [National Shoring] would, in the normal course, be informed that the service has been made," I find that service was proper under § 52-57(c).  *See Nelson*, 25 Conn. App. at 642; *see also Pantlin*, 196 Conn. at 237; *Ruiz v. YMCA of Bridgeport*, No. FBTCV106008474S, 2011 WL 783593, at *5 (Conn. Super. J.D. Fairfield, Feb. 8, 2011) (concluding that service on a "coordinator" of the organization, who regularly communicated with the organization and accepted the service on its behalf, was sufficient under § 52-57(c)); *McEvoy v. Plancher*, No. CV040199239, 2005 WL 834497, at *4 (Mar. 14, 2005) (holding that because the individual served under § 52-57(c) identified herself as office supervisor and accepted service for the LLC, "it was reasonable for marshal to believe that the supervisor was 'the person in charge of the office' at the time of service").

### B.      Liability for Delinquent Contributions

Plaintiffs allege that National Shoring failed to contribute certain sums of money to Plaintiffs for each hour worked by employees covered by the Agreement in violation of ERISA. They further allege that National Shoring failed to provide certain payroll audit documentation required under the Agreement.

ERISA requires employers to pay fringe benefit contributions pursuant to a valid collective bargaining agreement.  29 U.S.C. § 1145.  "Section 1145 establishes the elements necessary to make out a claim for failure to pay contributions."  *Trs. of Mosaic & Terrazzo Welfare, Pension, Annuity, & Vacation Funds v. Elite Terrazzo Flooring, Inc.*, No. 18-CV-1471, 2021 WL 1146560, at *9 (E.D.N.Y. Mar. 3, 2021), *report and recommendation adopted,* No. 18-CV-1471, 2021 WL 1146113 (E.D.N.Y. Mar. 25, 2021).  That statute states:

> Every employer who is obligated to make contributions to a multiemployer plan
> under the terms of the plan or under the terms of a collectively bargained agreement
> shall, to the extent not inconsistent with the law, make such contributions in
> accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

Plaintiffs have adequately pled breach of the Agreement and violation of 29 U.S.C. §

1145.  Plaintiffs allege that National Shoring entered into the Agreement with the Union.  ECF

No. 1 at ¶ 6.  Under the Agreement, National Shoring was required to make certain contributions

to the Funds and the Union for every hour worked by employees covered by the Agreement.  *See*

ECF No. 1 at ¶ 7; *see also* ECF No. 11-3 at 10–13, 56–59, 102–06.  The Funds are "employee

benefit plans" or "plans" within the meaning of Section 3(3) of ERISA.  29 U.S.C. § 1002(3);

*see* ECF No. 1 at ¶ 1.  Plaintiffs allege that the Funds conducted a routine payroll audit of

National Shoring and discovered that National Shoring has failed to pay $63,730.25 in benefit

contributions and $2,144.17 in union dues between November 2017 and December 2020.  *Id.* at

3 ¶ 10.  They further allege that the Funds incurred $2,066.25 in performing this audit and that

National Shoring is required to reimburse these costs under the Collection and Audit Policy.  *Id.*

at 4 ¶ 10; *see also* ECF No. 11-4 at 6–7 (indicating that the "cost of the field audits . . . shall be

borne by the Funds, except that the audited Employer shall be liable for the cost of the field audit

. . . [i]f the Funds are required to initiate a lawsuit to collect any delinquent contributions from an

audited Employer").  These allegations sufficiently set forth the elements of a claim for unpaid

contributions and accompanying liability under ERISA.  *See, e.g.*, *Gesualdi v. Zano Indus., Inc.*,

No. 21-CV-6097, 2022 WL 4238267, at *5 (E.D.N.Y. Sept. 14, 2022) ("Plaintiffs have asserted

that Defendant entered into [collective bargaining agreements, or "CBAs"] with the Funds and

failed to remit benefit contributions owed under the CBAs.  Thus, Plaintiffs have sufficiently

alleged facts supporting the elements of a claim for unpaid contributions and accompanying

liability under ERISA against the Defendant."); *Trustees of Pavers & Rd. Builders Dist. Council Welfare, Pension, & Annuity Funds v. Atl. Steel Sols., LLC*, No. 21-CV-02518, 2022 WL 4642735, at *4 (E.D.N.Y. Sept. 15, 2022) ("Here, plaintiffs allege that defendant is an 'employer,' and that the Funds are 'employer and employee trustees of multiemployer labor-management trust funds,' and 'employee benefit plans' under the ERISA.  Plaintiffs further allege that defendant was obligated to make contributions to plaintiffs pursuant to the CBA and that defendant failed to make the required contributions.  These factual allegations are sufficient to establish defendant's liability under ERISA for the unpaid contributions." (internal citations omitted)), *report and recommendation adopted*, No. 21-CV-2518, 2022 WL 4662723 (E.D.N.Y. Sept. 30, 2022), *supplemented*, No. 21-CV-2518, 2022 WL 11727626 (E.D.N.Y. Oct. 20, 2022). Therefore, Plaintiffs have stated a cause of action for delinquent contributions in violation of the Agreement and ERISA.

## C.    Damages

The Court must determine damages "with reasonable certainty" when there is a default judgment.  *Credit Lyonnaise Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).  It may use "an evidentiary hearing, detailed affidavits, or documentary evidence" to determine damages, *Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 191 (2d Cir. 2006), and must "ensure that there [is] a basis for the damages specified," *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).

29 U.S.C. § 1132(g)(2) provides:

(2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of title 26.

29 U.S.C. § 1132(g)(2).

Plaintiffs request the following damages: (1) unpaid contributions and union dues for the period from November 2017 through December 2020; (2) interest on the unpaid contributions; (3) audit costs; (4) liquidated damages; and (5) legal costs and attorneys' fees. *See* ECF No. 11-1 at 6.

## 1.    Unpaid Contributions and Dues

Plaintiffs seek $65,874.42 in unpaid contributions and union dues.  Under 29 U.S.C. 1132(g)(2)(A), Plaintiffs are entitled to damages for unpaid contributions, and under the Agreement, National Shoring is responsible for deducting union dues from covered employees' salary payments and paying these dues to the Union "by the 20th day of the month following the month in which they were deducted."  ECF No. 11-3 at 35, 81, 127.  The Funds hired a third-party auditor to conduct a routine payroll audit, and the audit found that National Shoring had failed to contribute $63,730.25 in benefits contributions and $2,144.17 in union dues between

10

November 2017 and December 2020. *See* ECF No. 11-5 at 7, 12; *see also* ECF No. 11-7 at 1–2 (auditor averring that his firm's audit found that "National Shoring owed benefit contributions in the amount of $63,730.25 to the Funds and unpaid Union Dues in the amount of $2,144.17."). Thus, I find with reasonable certainty that Plaintiffs have incurred $65,874.42 in damages from unpaid benefits contributions and union dues payments between November 2017 and December 2020.

### 2. Interest on Unpaid Contributions

Plaintiffs seek interest on the unpaid benefits from the due date of the contributions to the date of judgment. Under 29 U.S.C. 1132(g)(2)(B), Plaintiffs are entitled to interest on unpaid contributions. The Agreement sets the rate of interest to be paid on unpaid contributions at 12% per annum, *see* ECF No. 11-3 at 15, 61, 107, and the Delinquency and Audit Policy specifies that delinquent employers are to be "charged *simple interest* in the amount of twelve percent (12%) per annum," ECF No. 11-4 at 3 (emphasis added). So I use a simple interest rate of 12% per annum to calculate the interest balance. As illustrated in the below table, the total interest on unpaid contributions from the due date of the contributions to the date of judgment is $36,930.09, and I find with reasonable certainty that this interest balance is owed to Plaintiffs.

*Table: Interest Calculation*

| Benefit Contribution Month | Remaining Principal Balance | Interest Start Date | Date of Judgment | Days of Interest Accrual | Interest Balance |
|---|---|---|---|---|---|
| **November 2017** | $15,234.28 | 1/1/2018 | 6/13/2024 | 2355 | $11,795.09 |
| **December 2018** | $3,434.13 | 2/1/2019 | 6/13/2024 | 1959 | $2,211.77 |
| **February 2019** | $49.77 | 4/1/2019 | 6/13/2024 | 1900 | $31.09 |
| **April 2019** | $203.16 | 6/1/2019 | 6/13/2024 | 1839 | $122.83 |
| **August 2019** | $203.16 | 10/1/2019 | 6/13/2024 | 1717 | $114.68 |
| **September 2019** | $17,046.41 | 11/1/2019 | 6/13/2024 | 1686 | $9,448.85 |
| **October 2019** | $2,590.29 | 12/1/2019 | 6/13/2024 | 1656 | $1,410.25 |
| **November 2019** | $228.56 | 1/1/2020 | 6/13/2024 | 1625 | $122.11 |
| **December 2019** | $1,879.23 | 2/1/2020 | 6/13/2024 | 1594 | $984.82 |

| January 2020 | $203.16 | 3/1/2020 | 6/13/2024 | 1565 | $104.53 |
| February 2020 | $584.09 | 4/1/2020 | 6/13/2024 | 1534 | $294.57 |
| March 2020 | $177.77 | 5/1/2020 | 6/13/2024 | 1504 | $87.90 |
| April 2020 | $621.72 | 6/1/2020 | 6/13/2024 | 1473 | $301.08 |
| May 2020 | $8,820.66 | 7/1/2020 | 6/13/2024 | 1443 | $4,184.62 |
| June 2020 | $7,434.74 | 8/1/2020 | 6/13/2024 | 1412 | $3,451.35 |
| July 2020 | $3,840.43 | 9/1/2020 | 6/13/2024 | 1381 | $1,743.66 |
| August 2020 | $919.64 | 10/1/2020 | 6/13/2024 | 1351 | $408.47 |
| September 2020 | $259.05 | 11/1/2020 | 6/13/2024 | 1320 | $112.42 |
| **Total** | **$63,730.25** | | | | **$36,930.09** |

### 3. Audit Costs

Plaintiffs seek to recoup $2,066.25 in audit costs.  Under the Delinquency and Audit

Policy, "[t]he cost of the field audits shall be borne by the Funds, except that the audited

Employer shall be liable for the cost of the field audit under the following circumstances[:] . . .

[i]f the Funds are required to initiate a lawsuit to correct any delinquent contributions from an

audited Employer."  ECF No. 11-4 at 6–7.  Plaintiffs have initiated this litigation to collect

delinquent contributions from National Shoring, and so under the Delinquency and Audit Policy,

National Shoring is liable for the costs of the audit.  Plaintiffs have provided an invoice from the

Funds' auditor indicating that it accrued audit costs of $2,066.25.  ECF No. 11-5 at 2.  Thus, I

find with reasonable certainty that Plaintiffs have incurred $2,066.25 in audit costs.

### 4. Liquidated Damages

Plaintiffs also seek liquidated damages in the amount of $12,746.05.  Under 29 U.S.C. §

1132(g)(2)(C), Plaintiffs are entitled to an amount equal to the greater of "(i) interest on the

unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in

excess of 20 percent (or such higher percentage as may be permitted under Federal or State law)

of the amount determined by the court under subparagraph (A)."  *See also Perishable Food*

*Indus. Pension Fund v. Am. Banana Co.*, No. 01-CV-1922, 2003 WL 21542316, at *5 (S.D.N.Y.

12

July 1, 2003) ("Under 29 U.S.C. § 1132(g)(2)(C)(ii), a double interest payment or alternative liquidated damages are provided for in order to compensate a plaintiff for costs incurred with delinquencies."). The Agreement calls for "liquidated damages in an amount of twenty percent (20%) of the amount of the delinquency." ECF No. 11-3 at 15, 61, 107. 20% of the unpaid contributions is $12,746.05, and so I find with reasonable certainty that National Sharing owes Plaintiffs $12,746.05 in liquidated damages.

### 5.    Legal Costs and Attorneys' Fees

Finally, Plaintiffs seek to recoup legal costs of $484.25 and attorneys' fees of $2,000.00 associated with bringing this action. Under 29 U.S.C. § 1132(g)(2)(C), courts may award "reasonable attorney's fees and costs of the action." Plaintiffs' counsel has filed invoices indicating that his firm has incurred $484.25 in legal costs—$402.00 to pay the filing fee and $82.25 to serve National Shoring. ECF No. 11-10 at 1. I find these costs to be reasonable, and so I award Plaintiffs legal costs in the amount of $484.25.

Plaintiffs' counsel has also filed an invoice and an affidavit indicating that the firm expended eight hours on the litigation at an hourly rate of $250.00, resulting in $2,000.00 in attorneys' fees. ECF No. 11-8 at 2; ECF No. 11-10 at 1. "The United States Supreme Court has endorsed the 'lodestar approach' to calculate reasonable attorneys' fees. Under this approach, the Court determines reasonable attorneys' fees by multiplying the number of reasonable hours expended by the reasonable hourly rate. In general, the 'lodestar looks to the prevailing market rates in the relevant community.'" *Trs. of the I.B.E.W. Loc. Union No. 488 Pension Fund v. Norland Elec., Inc.*, No. 3:11-CV-709, 2015 WL 3581011, at *2 (D. Conn. June 5, 2015) (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551–54 (2010)). Using the lodestar approach, I find eight hours to be a reasonable amount of time spent on drafting the complaint,

13

motion for default entry, and motion for default judgment, and I find $250.00 to be a reasonable hourly rate in the relevant legal market. *See, e.g.*, *id.* at *5 (collecting cases from the Second Circuit and this District and finding expenditure of 11.5 hours at a rate of $250.00 per hour reasonable in default ERISA case); *see also LaBarbera v. D & R. Materials, Inc.*, No. 06-CV-2100, 2007 WL 1041666, at *4 (E.D.N.Y. Apr. 3, 2007) (finding expenditure of 12 hours at a rate of $340.00 per hour reasonable in default ERISA case).

### D.   CONCLUSION

For the reasons stated above, I GRANT Plaintiffs' motion for default judgement.  Default judgment is entered in Plaintiffs' favor against National Shoring in the amount of $120,101.06 as of June 13, 2024.  This calculation includes the following:

- $65,874.42 in unpaid benefits contributions and union dues;
- $36,930.09 in interest on the unpaid benefits contributions as of June 13, 2024 (using a simple interest rate of 12% per annum);
- $2,066.25 in audit costs;
- $12,746.05 in liquidated damages; and
- $2,484.25 in legal costs and fees.

This calculation assumes judgment will be entered on June 13, 2024.  If the Clerk is not able to enter judgment on June 13, 2024, the Clerk shall add $20.95 per day to the total, up until the day judgment is entered.  Upon the entry of judgment, interest will accrue at the legal rate under 28 U.S.C. § 1961.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                June 13, 2024